Q77GbufC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

BUFFALO BIODIESEL, INC.,

              Plaintiff,

          v.                         25 Cv. 8905 (ER)

LIFECYCLE RENEWABLES, INC.,

                         Conference

              Defendant.

------------------------------x

                         New York, N.Y.
                         July 7, 2026
                         11:30 a.m.

Before:

                 HON. EDGARDO RAMOS,

                         District Judge

                 APPEARANCES

BUFFALO BIODIESEL INC.
     In-House Attorney for Plaintiff
BY:  JEREMIAH LENIHAN

BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ PC (GA)
     Attorneys for Defendant
BY:  LINDSAY E. RAY

Q77GbufC

(Case called)

MR. LENIHAN:  Good morning, your Honor.  Jeremiah Lenihan on behalf of Buffalo Biodiesel, Inc.

MS. RAY:  Lindsay Ray with Baker Donelson on behalf of the defendant, Lifecycle Renewables, Inc.  With me today, I have two summer associates that we have allowed to sit at the counsel's table if that's right all right with your Honor.

THE COURT:  Good morning to everyone.  So this matter is on for a conference.  We are here at the request of LIfecycle Renewables.  Just to sort of set the table, earlier in the summer, I entered what I thought to be a noncontroversial protective order and then after that, what I thought to be a noncontroversial consent order for changing out counsel.

First of all, Ms. Ray, I think it's clear there was some suggestion in your first letter that perhaps plaintiff was not completely candid with the Court concerning the consent aspect of that order; correct?  You can remain seated, by the way.

MS. RAY:  Yes.  To the extent it represented that Buffalo Biodiesel's former, now former, and proposed new counsel consented, I have no reason to doubt that there is consent on that end of it.  However, to the extent it implied that Lifecycle, we, had given consent, that was incorrect.

THE COURT:  Can you just come closer?

Q77GbufC

MS. RAY:  Yes.

THE COURT:  Mr. Lenihan?

MR. LENIHAN:  If I can be heard on that.  Do you want me to stand?

THE COURT:  You can be seated.

MR. LENIHAN:  Mr. Geron had e-mailed Ms. Ray, I believe it was on June 5th, that I'd be coming into the case. We filed our consent, which we believed we did not need to seek opposing counsel's consent for a substitution of counsel.  We filed that on June 8th.  Ms. Ray followed up, I believe on June 8th, stating she objects, and she's going to notify the Court via letter.  She was out of the country at the time.  We had discussed that we were going to meet and confer on this issue.  We did that the following week.  So there's no indication that there was some burden placed on us to notify the Court that Lifecycle had opposed our substitution of counsel.

THE COURT:  OK.  But it does raise an issue because the protective order has a provision concerning documents that are to be reviewed by outside counsel only.  So, Mr. Lenihan, the protective order was entered.  It was entered on consent of the parties.

How do you intend to get around that provision?

MR. LENIHAN:  To ask the Court to modify that provision.  And we set forth the case law that would allow the

Q77GbufC

Court to modify under the standard.  There's the four factors that the Court has to rely upon when looking at whether or not there's unreasonable reliance on behalf of the other party, and that's the *EDPM* line of cases, and the four factors all weigh in favor of Buffalo Biodiesel.

It is the scope of the protective order.  The scope is one of the blanket protective orders.  It doesn't designate or really sufficiently lay out the difference between what is confidential, what is attorney's eyes only, or what is outside counsel's eyes only.  It allows the parties to have almost unfettered discretion in making that type of designation.

When you look at that *in re September 11* case -- I'm sorry, the *Radio* case, in one of the footnotes, the Court discusses that the different levels of designation are really -- there should be some material aspects to them.  So when you have -- when you are looking at outside counsel's eyes only, that's very highly sensitive information, and that's not what you have in this case.  This case is a tortious interference case, conversion case.  It's not the type of overly-complicated case that your Honor's used to seeing.  It's not a patent infringement case, it's not a trade secret case.

I know counsel cited the *Revlon* case that your Honor oversaw.  That was a case --

THE COURT:  What case?

MR. LENIHAN:  The Revlon case.

Q77GbufC

THE COURT:  OK.

MR. LENIHAN:  So the *Revlon* case, where individuals that left Revlon, went to the competitor, they had trade secrets, they had confidential material, your Honor entered one of those outside counsel's eyes only designations in the protective order.  So it's just not that case.  It's not overly complicated.  Counsel for defendant has not been able to articulate what exactly is the type of material that's necessary that would prevent somebody like myself from putting my eyes on.  I can get into why I am not a competitive decision maker, but I started at the first prong on *EDPM*, and that's the scope of the protective order.

The second prong would be the duration of the protective order.  It's not a protective order that sets forth that all of these materials are sealed in posterity.  It's limited in nature.  It talks about that it's during the "pretrial phase."  That factor weighs in front of us.

The third factor is is the Court engaged in some judicial fact filing when it issues the protective order?  Are they provided with documents?  Is there an evidentiary hearing?  That's not here.  We have a stipulated protective order.

And then the fourth factor, which is the reliance that the defendants would have on the protective order, is just not here.  So when Courts talk about --

THE COURT:  Talk about that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q77GbufC

What do you mean it's not here?

MR. LENIHAN:  When you look at the reliance prong under the *EDPM* line of cases and a whole host of cases, reliance has to be where a party relied on information that was created because of the protective order.  So Martindale is this seminal case.  Folks testified, they were deposed pursuant to protective order, there was criminally adjacent allegations, and because people testified and they believed that their testimony was going to be protected under the scope of the protective order, the Second Circuit said that that was a type of reliance that would not -- that would meet the standard.

Another piece of reliance is if a party agrees to a settlement and a document is created in furtherance of litigation based on the nature of the protective order.  That is also reliance that the Courts are to look at.  So there's no real reliance here on behalf of the defendants.

THE COURT:  I think after review Ms. Ray telling me that there was absolutely reliance, otherwise they wouldn't have signed it.

MR. LENIHAN:  So say that, but reliance in a way that the Court is supposed to look at these issues is different than saying, well, Judge, we've relied on it.  It's not millions of documents like some other cases have found there to be reliance is applicable here.  Ms. Ray has turned over 224 pages of documents.  We just provided 1200 pages of documents.  To the

Q77GbufC

extent that there has been time spent to determine the different designations between confidential, attorney's eyes only, or outside counsel's attorneys eyes only, all it takes is just changing the name or the folder in which outside counsel's eyes only exist.  That's it.

It's not this big endeavor.  We are not years into litigation.  There hasn't been deposition testimony where people have relied on the protective order.  There hasn't been any documents created like a settlement document in light of the protective order.  So that true reliance that the Courts look at and dig into is just not here.

THE COURT:  Let me ask you this because I think it's the issue is going to be raised.

Is it your plan or was it your plan to litigate this case by yourself?

MR. LENIHAN:  With the help of another inside in-house counsel.

THE COURT:  OK.

MR. LENIHAN:  And a paralegal.

THE COURT:  Very well.  Thank you.

Ms. Ray?

MS. RAY:  Yes, your Honor.  Thank you.  So I think it would be helpful to go through some background here to talk about what's really at issue in this case.  Mr. Lenihan, highly qualified, great history and experience as a former fellow

Q77GbufC

prosecutor inherited quite the complex case that is way more than just a tortious interference or conversion case.

His client — well, he's representing Buffalo Biodiesel here as in-house counsel — brought tortious interference claims, unjust enrichment, fraud, and deceptive business practices claims alleging in patterned practice in listing 44 exemplars potential customers in common.  Let me take a step back here.  Both of our clients are in the waste vegetable oil industry and operate, our client, eastern seaboard, essentially Boston through Philly and along the I-95 corridor, his client, home office in Buffalo, New York region but expanded out, whole state of New York, whole state of Pennsylvania, Ohio, and really into the surrounding states now.

So you can imagine along that I-95 corridor here, including Connecticut, New York, New Jersey, are really where there have been clashes and interactions where our understanding of Buffalo Biodiesel's approach is that they don't view the restaurants that they collect the waste vegetable oil from -- our client calls them customers, clients. Buffalo Biodiesel refers to them as suppliers.  And so our understanding is they show up.  A lot of these restaurant are small mom-and-pop shops, often not speaking English as their first language.  They say, hey, you've got this waste.  We can do something with it.  We'll pay you X amount for it.  Enter into this five-year contract locked in.

Q77GbufC

I haven't really looked at one of these contracts, but I am assuming they liquidated damages and everything else because our understanding is that, then, when one of these customers maybe isn't getting the service they want -- and our guys, they get lots of complaints about, hey, we have Buffalo Biodiesel to come pick up our oil.  They are not showing up, they are not answering our calls.  We are not getting paid.  We want to work with you instead.  And then we go to engage with them and get slapped with a cease and desist letter.

Not only that, but then Buffalo Biodiesel, as part of its marketing strategy and competitive business strategy — and this is all set forth in our answer and counterclaims — they then issue notice letters to these customers of theirs — they call them "suppliers" — to say, no, you agreed to supply exclusively to us for these next however many years.  If you don't stay with us, we will sue you.  In response, our clients very much denied all of that.

In addition to these practices as we understand them, there was also at least a time — and we look forward to getting discovery on this — that Buffalo Biodiesel's reps or at least some of them would make misrepresentations to get their foot in the door.  For example, about, I think, two, three years ago, Lifecycle acquired a company called Greenearth as part of its expansion into New Jersey.  When Lifecycle, our guys, went to service those locations, their guys were told that someone from

Q77GbufC

Buffalo Biodiesel had told them, oh, Greenearth was out of business, and it was Buffalo Biodiesel that was authorized to take over that account, which was, of course, untrue.  It was Lifecycle.

By the time our guys got wind of this -- and I was the one to send the demand letter saying, hey, we understand this.  Why don't you go release those locations from this five-year contract?  They don't have to come to us, but you should let me know they have the option to choose who to work with.  It was Greenearth that Lifecycle acquired, and we wanted them to be given the choice.  Buffalo Biodiesel did not do that.  And instead, they filed this lawsuit.  So we in our counterclaims included fraudulent inducement, tortious interference, unjust enrichment, various federal and state consumer fraud, unfair trade practice violations, including New York, New Jersey, Connecticut, and vexatious litigation.

They had filed in the Western District.  It got transferred here.  You know that history, your Honor.  I do want to point out that after we had our initial conference last November, there were some initial exchanges of discovery, typically belated by opposing counsel at the time.  Listed first in the list of individuals likely to have discoverable materials was Mr. Pat Balkin, who I understand is the former general counsel.  I think he is technically still counsel of record, but I've learned that he's not involved anymore, so

Q77GbufC

that might need to get corrected on Buffalo Biodiesel's side. This intertwining of litigation, there's not the separateness like you would have in other cases of I am wearing my business hat in business and marketing strategy versus I am wearing my litigation strategy. Our understanding is it's one in the same.

THE COURT: Where do you get that understanding from?

MS. RAY: Well, it's from my client, it's from the reports from these customers coming up to and through my client, it's news reports even announcing the bringing on of Mr. Lenihan and the other new counsel. There's, if the news releases and reports are to be believed, a 300-million-dollar investment into Buffalo Biodiesel by an investment firm. So I think that might be related to the changing of guard. I don't know.

I think the new CEO doubles as the chief legal officer, who I imagine Mr. Lenihan reports directly to. And in those press releases, they make it very clear, central to our business are these state cases and this federal case and everything else. Especially because of our challenge of Buffalo Biodiesel's in-house legal offices use of these lawsuits again these competitors, in their responses to our interrogatory requests, they produced dozens of pages listing hundreds of lawsuits of them against these small restaurants. And that's just -- it could be scratching the surface.

Q77GbufC

It would be hard for me to really imagine this playing out to have in-house counsel handle the discovery and determine what's relevant, what's not, what's confidential, what's not, and to not have some kind of conflict in there, frankly.  And that is --

THE COURT:  I mean, it happens quite regularly.

MS. RAY:  And separate and in addition to the fact that we are direct competitors in the market.  If we worked from Judge Parker's example — because we understand if things refer to the Magistrate Judge, she will be the one -- and we put that in our cover letter.  To the extent that Mr. Lenihan has questions about the specificity, the cover letter makes clear how this highly confidential tier is reserved for more sensitive information such as competitive pricing, customer listings, and competitive business financial information.

It goes both ways.  They get the protection of it not going in-house to my client when they produce materials about these competitive business practices that include their in-house counsel.

THE COURT:  Conversely, your client gets the benefit of looking at the discovery if we take out the outside attorney eye only provision; correct?

MS. RAY:  It could.  But in my experience, it's hard for people to forget half of their brain when they are walking into a meeting.  Once the toothpaste is out of the tube, it

Q77GbufC

doesn't go back in as far as the knowledge that you get from these situations.  Mr. Lenihan is new, and I understand he's been on the job there one month, maybe two.  Given the history of these direct competitors, there's not a lot of trust.  The fact that the affidavit that was submitted in support of Mr. Lenihan's letter coming from Mr. Majumdar, the current former CEO — now he's at Veritas Capital — maybe, maybe not would not try to have a thumb the scale, frankly, because if he is upset enough now to put that in and to, based on the impression I got from our meet and confer, be pressing so hard to not have this outside attorney's eyes only designation --

THE COURT:  Well, he put it, I believe, in a business context.  He said, look, if I had seen this, if I had been consulted about it, I would have objected because my plan was to bring this lawsuit in-house; right?

MS. RAY:  In sum and substance, that was said.  I imagine if Mr. Geron was here, he might have something else to say.  He's, of course, not here?

THE COURT:  Also, I don't know that the affidavit weighs one way or the other.  It was an affidavit -- rather, it was an agreement that was stipulated to by the parties, that was entered by the Court, and if the client wants to complain now, well, he should have told me, I didn't know, well, that's a little day late and a dollar short.  Thank you for that background.

Q77GbufC

To Mr. Lenihan's point, these are not nuclear deals we are talking about, this is waste vegetable oil.  I'd be interested to hear this from you.  Is there a real chance that highly confidential materials will be disclosed in the course of discovery?

MS. RAY:  Yes.  And we do have -- as Mr. Lenihan pointed out, our initial production was the nonconfidential portion.  On our end, first level review is complete and second level review meaningfully underway and close to finalized, but we are waiting for the dust to settle here.  Yes, there is significant information involving pricing, specifically, and also documents that would fall under the customer lists.  Given their history of going to our client's customers, giving them false representations, and getting them to sign into these five-year agreements and then not releasing them when they want to come back to us or some other competitor, we have serious concerns with letting anyone with the @buffalobiodiesel.com email address see who our customers are, frankly.

Are there going to be security measures taken in the shared drives?  Where is this stuff going to be?  How is it going to be treated?

THE COURT:  They make the representations that they will take appropriate measures.

Why shouldn't I accept that?

MS. RAY:  Again, I think what many Courts -- the

Q77GbufC

approach many Courts have done in my experience when you have these cases that have antitrust and unfair business practices allegations between direct competitors, there is this real concern that you can take all of these protective measures, but even the best of people slip up sometimes.  And given --

THE COURT:  That's true even if it weren't outside attorney's eyes only situations.

MS. RAY:  That is fair, your Honor.  And yet also, when you are sharing a system -- my client has shared our equivalent attorneys the M-drive, net docs, and all of these shared drive files, I'll call them, within the network.  The default is for all of them to be shared unless otherwise restricted.  Some take the other approach.  It would be, I would think, more difficult to keep it under wraps, both technologically -- is this an IT person who can see everyone's e-mails when I send something?  Is there a printer that's shared?  I don't know how separate their offices are or aren't. My understanding is that they are not designed to be separate, and instead, it's shared.

THE COURT:  Again, what's the basis for that representation?

MS. RAY:  Well, your Honor, I don't know what I don't know.  And Mr. Lenihan, I trust, will have more knowledge of that.  I am curious about what the plan is to be able to go through all of this.  In addition, yes, there was an initial

Q77GbufC

production made over this 4th of July weekend, but it was a single merged PDF.

THE COURT:  It was a --

MS. RAY:  A single merged PDF that didn't comport with our ESI protocol, the initial documents with metadata and everything else.  Speaking with our vendor, it's not something we can upload to Relativity and have it be in this reviewable and digestible format that was agreed to.

THE COURT:  But that's a separate issue.

MS. RAY:  It is a separate issue.

THE COURT:  I guess, Ms. Ray, I'm still having a difficult time seeing what type of documents.  What you have described are garden-variety business documents, including customer lists and pricing lists, that are exchanged every day in litigation before this Court, and not every protective order has an outside counsel eyes only provision.

MS. RAY:  Your Honor, yes, yet in those cases, my understanding is that it's not a direct competitor to competitor case.  When you do have these direct competitors with allegations like these that involve unfair business practices, Sherman Anti-trust violations, and vexatious litigation --

THE COURT:  You've got a stronger position right now because you have got a court ordered protective order.

MS. RAY:  Yes, your Honor, and that is something we

Q77GbufC

raised in our case.  And Mr. Lenihan's standards that he raises are my understanding the initial question of should we or shouldn't we and what level should we order.  Here, we have a protective order that's already been submitted and entered in which we have been acting in reliance on and our clients have been acting in reliance on.

The standard necessary for opposing counsel to prove here is heightened, where we have relied on it in entering into it, our client has.  We have done, again, the bulk of the review — not the production yet — but we want this to move forward, we are ready to have it move forward, and I hope that Mr. Lenihan has reviewed the agreed search terms and conditions and has inherited the custodial files and has all the vendors in place as agreed.

There is precedent -- it's really your Honor's discretion, of course — I don't need to tell you that — to manage this case and to weigh the fact that our client has a right to not have this whiplash of, oh, there's a changing of the guard, so let's redo all of the hard work.  It took months of negotiation and meet and confers, and there's no way we are going to meet the already moved out July 31st fact discovery deadline because we've only each made our initial productions; right?  It's well begun, and it would be unfair and prejudicial to my client for those gears that are finally in motion to have to go back to square one.

Q77GbufC

THE COURT:  Mr. Lenihan, your client has buyer's remorse concerning the agreement that prior counsel entered into; too bad, so sad.

Why are you making the defense go back to the argument table?

MR. LENIHAN:  I understand that, and it's unfortunate that we are here because of that.  There was a stipulated protective order.  Mr. Majumdar, he stated he was not aware of this.  It had always been the plan, like your Honor stated, for in-house counsel to take it over.  It's the factor that weighs against us, I get that, but these protective orders are not, as you know, set in stone.  They are, under Rule 26, pursuant to good cause, the Court can modify a protective order.

I know Ms. Ray talked about the heightened standard.  It's the *Martindale* line of cases, where the Court has to weigh whether or not it was improperly granted, the protective order, or there is extraordinary or compelling reasons.  You only apply the heightened standard if the other side can show true reliance.  And I've already gone through why there's not true reliance here through that four-factor test.

THE COURT:  Did you mention why there's true reliance?  Well, there is true reliance if they already conducted a lot of the review of the documents in accordance with that previously entered order.

MR. LENIHAN:  In the true reliance, you have to weigh

Q77GbufC

the four factors I mentioned under *EDPM*.  Again, that's the scope of the protective order, the duration of the protective order, whether or not there's that judicial fact finding, and then you also weigh the reliance.  The case law is made clear that this type of reliance is not enough to apply that heightened standard.

Because of that, Judge, there was also the discussion as to what exactly is Lifecycle so concerned about.  We have the ESI that's filed pursuant to Ms. Ray's letter, and we have all the search terms.  It's going through e-mails looking for things like the term equipment, container, cancellation, change, cease.  This isn't anywhere close to an overly complicated, highly complex patent infringement IP-type litigation.

Looking at all of the factors -- and I understand that there has been some work put into creating those designations.  When you look at Buffalo Biodiesel's desire to have counsel of their choice — which is me — to take the lead on this thing, to move this case forward -- and I think Rule 1 is also at play when the Court is looking at how to interpret Rule 26.  I know a couple of Courts talked about Rule 1.  Is it going to be just the Court's -- how do you find good cause?  You look at is it just, is it speedy, is it efficient, is it going to promote less costly litigation.  And me being part of this team, being the lead of this team is going to further all of these ends.

Q77GbufC

THE COURT:  How big is your legal department?

MR. LENIHAN:  We have three attorneys.  We are looking to hire another attorney, and we do have the -- our new president is consider the chief legal officer.  So it's three attorneys currently, the chief legal officer, and hopefully a fourth very soon.

THE COURT:  If we were to remove the outside attorney counsel eyes only, I take it that would include that your chief legal officer would be able to view the documents?

MR. LENIHAN:  He's an attorney, so he would fall under that attorney's eyes only provision.

THE COURT:  So he's both the chief executive officer --

MR. LENIHAN:  The term is the president.  What exactly is --

THE COURT:  President and chief legal officer.

MR. LENIHAN:  Correct.

THE COURT:  And this change would then be a substantial change in what is currently the protective order.

MR. LENIHAN:  And we are willing to create some walls. I am willing to work with Ms. Ray to figure out what exactly she's concerned with, what type of protection she needs.  She mentioned the toothpaste going out the bottle.  I've dealt with protective orders my whole career where people's lives are at stake.  It's my old line of work trying to protect witnesses.

I take protective orders very seriously, and I can handle the scope of the protective order.  So I am willing to work with Ms. Ray to discuss what type of provisions would be satisfactory to Lifecycle.

THE COURT:  Here's my recommendation because I think we are headed to dueling motions, and rather than put you folks and your clients through that, I would prefer that you talk, meet and confer, and try to come up with an agreement.  Failing that, then you can come back to me and propose a schedule.  And I don't know whether it would be a schedule or rather a motion to enforce the agreement as is to be filed by Ms. Ray or a motion to amend the agreement to be filed by Mr. Lenihan.  I will let you folks speak to that, but I would prefer that it only be on one track, that you don't file motions at the same time.  I do think that this is something that you folks ought to be able work out.

Let me ask -- Ms. Ray, I'll ask you since you have been on it longer.

I assume that you are newer to the case relatively?

MR. LENIHAN:  Relatively, yes.

THE COURT:  How voluminous do you expect the discovery to be?

MS. RAY:  Well, there's party discovery and then there's third party discovery.  And given that they listed 44 exemplar customers --

Q77GbufC

THE COURT:  I am assuming that third party discovery is not going to produce a lot of outside attorney eyes only documents or any.

MS. RAY:  Presumably not.  You are right, your Honor. I'd say probably in the thousands of documents.

THE COURT:  Again, in my experience, that's not a huge production.

Realistically, of those, how many would fall into the category of outside attorney eyes only?

MS. RAY:  Probably most of them.

THE COURT:  Most of them?

MS. RAY:  Because the crux of these allegations is the list of competitors, the pricing, and everything else.  And I do want to emphasize that the search terms that Mr. Lenihan highlighted -- if you turn the page, there's a whole list of 20 terms under policies, re: marketing and solicitation, that include target, compete or competitor, minimums, offer expansion, litigation lawsuits, all of this.  On behalf of my client, I think this as just waste vegetable oil -- if an investment firm invested $300 million in Buffalo Biodiesel --

THE COURT:  I understand it is a growing industry.

MS. RAY:  Significant in renewable energy, but it really is a good amount of what will be talking about, what we will be reviewing.  And I hope that we are going to get significant productions from Mr. Lenihan that reveal to us,

Q77GbufC

approving or potentially disapproving, what we understand their business practices to be and their core practices.

In the cover letter and then in the protective order as described, it is this sensitive information likely to cause injury. And we do know that Buffalo Biodiesel is an aggressive member in the market who will take information about how we approach sales and how we price it, how we service our competitors, and, given the opportunity, they will use it to their advantage.

THE COURT: Again, you are making a position there I am not prepared to accept based on what's before me. Competitors are competing against each other all of the time. Any information they get, they are going to use to their advantage. But in the context of a federal civil case, at least, with a protective order, we expect the parties to comply with those protective orders.

Mr. Lenihan?

MR. LENIHAN: Just very briefly, your Honor. What Ms. Ray mentioned as far as the policies of compete, my understanding is that's what we have to turn over. We have to conduct our internal research and turn that over to Lifecycle. That's part of Schedule C. That's what we have to do. That being said, it's not an overly complicated case where we need to have this highly sensitive level of outside counsel eyes only.

Q77GbufC

THE COURT:  I largely agree with that, so that's your strongest point, but I think that there's probably a way for you folks to come to some understanding.  I'll give you some time to have those discussions.  If not, I will ask you to, within two weeks, submit a letter to the Court letting me know that you have reached agreement — and you can let me know sooner if you've reached agreement — or letting me know that you wish to brief it and a proposed schedule.

MR. LENIHAN:  Sure.

THE COURT:  OK.  Anything else that you wish to raise, Mr. Lenihan?

MR. LENIHAN:  Judge, just on a personal level, I have been in front of the Second Circuit one time, and you were on the panel.  It's nice to see you again.

THE COURT:  Was Judge Calabresi on that panel?

MR. LENIHAN:  I believe so.  It was May 21st of 2019, and I remember you were dealing with a very highly public and newsworthy case.

THE COURT:  Not yours.

MR. LENIHAN:  No, that's a complicated case.  I just wanted to say nice to see you again.  It's a really cool experience to be in front of the Second Circuit.  I hope everyone here gets a chance to do that.

THE COURT:  How's it possible that you only appeared in the Second Circuit once?

Q77GbufC

MR. LENIHAN:  I was more of a trial attorney.  I'm not much of an appellate guy.

THE COURT:  Ms. Ray, is there anything else from you?

MS. RAY:  I take it from the way this went that the inclination to revisit your consent order is a negative since you have asked us to work together with Mr. Lenihan and not discuss so much the outside counsel here.

THE COURT:  I am indifferent as to how you folks come out.  If you ask me to enforce the order and convince me on the facts and the law it is what I should do, then that's what I will do.  Same to you, Mr. Lenihan.  I've told you what I think are your side's best arguments.  But yes, strongarm him.

MR. LENIHAN:  We are going to asking for -- I think we can confer about amending the scheduling order.  That's something we can --

THE COURT:  That's fine if you folks agree.

MR. LENIHAN:  Sounds good.

THE COURT:  OK.  We are adjourned.

(Adjourned)